UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CARLOS M. SANCHEZ,

Plaintiff,                          17-CV-455

-against-

THE CITY OF BUFFALO, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PLAINTIFF'S RULE 59 (a)(1)(A)
MOTION
FOR NEW TRIAL**

Pursuant to Fed. R. Civ. P. 59(a)(1)(A), (d) and in conformity with Fed. R.

Civ. P. 59(b), plaintiff in the above matter **CARLOS M. SANCHEZ,** hereby moves this court

for a New Trial after Jury Trial Verdict, and as grounds therefore states:

## STATEMENT OF FACTS

On October 10th 2023, Hon. Lawrence J. Villardo scheduled Jury trial on the remaining

claims to the above matter to be held on February 5th, 2024. Pre-trial order issued.

On January 12, 2024, the scheduled trial was adjourned by the court.

On April 24th, 2024, Status Conference was held. Hon. Lawrence J. Vilardo scheduled

new jury trial date for December 9th, 2024. Pre-trial order issued.

on November 19th, 2024, Status Conference was held. Hon. Lawrence J. Vilardo

indicated that due to current ongoing criminal trial, scheduled jury trial date for December 9th,

2024 would not proceed. Court proposed case transferred to another Judge.

On November 22nd, 2024, the case was reassigned to Hon. John L. Sinatra, Jr.

1

On December 16th, 2024, Telephonic Status Conference was held before Hon. John L. Sinatra, Jr. where the Court advised the parties of potential trial dates in January or March.

On January 8th, 2025, a Telephonic Status Conference proceeding was held before Hon. John L. Sinatra, Jr. where the Court proposed two trial dates to parties, 3/17/2025 or 5/5/2025. The parties indicated to be available both dates. Court indicated would update the parties in two weeks with the trial date.

On January 28th, 2025, status conference proceedings held before Hon. John L. Sinatra, Jr., Court did set trial to commence with jury selection on May 5th, 2025. Status conference to follow.

On April 24th, 2024, before Hon. John L. Sinatra, Jr. what was believed by the parties to be a conference status, was, according to the facts a pretrial conference proceeding in where the court indicated that the trial was to be held in about ten days, May 5th, 2025.

on May 5th 2025, trial commenced with jury selection. During jury selection, presiding judge Hon. John L. Sinatra, Jr. conducted each and all Voir Dire questionnaire. A Jury panel of eight was selected, followed by preliminary instructions to the jury and thereafter both plaintiff and defendant opening statements followed.

On May 6th, examination and cross examination was conducted for officer Maurice A. Foster, officer Michael J. Palizay, officer Lamar M. McCulley, officer Lindsay Laracuente-Zgoda and officer Brandon Hawkins. This same day, represented by the office of NY attorney general, witness Hon Brenda M. Freedman entered her Motion to Quash a subpoena for testimony.

On May 7th, court was closed.

On May 8th, trial continued with officer Brandon Hawkins continuation of examination. Followed by examination and cross examination of officer Cory Espinosa, officer Lauren Tripp and Michael Farley. Court recessed. Furthermore, court also heard arguments on Hon. Brenda M. Freedman motion to Quash, and the court granted the motion.

On May 9th, trial continued with examination and cross examination of officer Mark P. Andrzejak. Evidence presented by plaintiff to be used at examination of said witness was not allowed by the court. Plaintiff objected. Evidence was marked for appeal as **"Court Exhibit 1"**. Parties rested their cases.

May 12th, Jury was not present in court, Jury charge conference was held where the court and the parties discussed and agreed the Jury charge form.

May 13th, Jury trial continued with closing arguments followed by the court delivering the Jury charge. Jury returned verdict for the defendants.

On May 14th, Judgement was filed and entered.

Plaintiff now files for post-judgment relief under Federal Rules of Civil Procedure 59. Plaintiff also brings to the attention of the court that a notice of appeal will be filed with the court shortly after in order to preserve tolling period and appealability to all prior judgements in this matter.

## ANALISYS AND PROCEDURAL POSTURE

### A. Analysis

After a week-long trial a jury panel of eight found for defendants on all claims. That verdict cannot stand, however, because the jury was exposed to significant amount of erroneous and highly prejudicial testimony, inadmissible evidence was presented to the jury, evidence that should have being admitted was precluded. Further, trial date was proposed and cancelled many

3

times, parties were put "on call" for an available trial date and when that window was open, a very short notice of eleven days was given to prepare for trial.

Subpoena to quash was granted which prevented witness testimony to reach the jury. Jury pool and jury selection was heavily sided against plaintiff. Selective jury was left in the panel even when such jury was to be unfair to plaintiff, where the few fair ones were removed from Jury. New trial is warranted and plaintiff Rule 59 motion should be granted.

### B. Procedural posture

At the outset, the Court must satisfy itself that it retains jurisdiction to resolve this dispute given that plaintiff have not, but will be filing a notice of appeal, which typically divests a trial court of jurisdiction. But Fed.R.Civ. P. 4(a)(4)(B)(i) provides that the trial court retains jurisdiction to resolve motions under Rule 59 even after a notice of appeal is filed. ("(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.", provided the Rule 59 motion is timely filed under Rule 59(a) and is timely ruled on or is deemed denied under operation of Rule 59. All proceedings in the Courts of Appeals are stayed while the motion is pending in the district court.

The Court also finds that Plaintiff timely sought post-trial relief. The jury rendered its verdict on May 13, 2025. The Court entered judgment on May 14, 2025. Rule 59(b) states that the motion should be filed within 28 days, not counting the day the judgement was entered.

## STANDARD OF REVIEW

Fed.R.Civ. P. 59 (a)(1) states in relevant part that "[t]he court may, on motion, grant a new trial on all or some of the issues-and to any party-... (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court;...

(b) [A] motion for a new trial must be filed no later than 28 days after the entry of judgment."

## ARGUMENT

Plaintiff contends the court should vacate the judgement as to all claims and grant his Rule 59 motion for new trial as there exist clear error of law, proceeding irregularities and unfair practices.

### 1. CLEAR ERROR EXISTS WHERE THE COURT GAVE THE JURY INSTRUCTION THAT THE "AUTHORIZED FUNCTION" ELEMENT WAS ESTABLISHED IN THE 2016 CLAIMS.

Child custody and visitation between two parents is not police "Official Function". The court had questions of law that were not addressed. Those questions were: 1) Did plaintiff violate the family court order? 2), Is child custody/visitation a police official function?. Those two questions went unanswered and that resulted in plaintiff spending the majority of trial time demonstrating to the jury that;

      a) The family court order was not violated.

      b) Family custody matters are civil matters, not criminal matters,

      c) Police officers are not authorized to police civil matters,

      d) Child custody/visitation dispute is not a police officer official function.

Furthermore, the Court erred by instructing the jury at the close of trial that the element of authorized function was satisfied. that the police involvement in a child custody/visitation was an authorized function. It is well settled that:

5

**A)** Police officers' function is to enforce the penal law, codified law related to crimes or issues affecting the general public.

**B)** Police officer have no authority to determine contempt (specially the matter here, alleged family court violation contempt). That power is vested to the courts (family court, where the court determines contempt affording due process and punishment instead of jail time.).

**C)** In family offenses, Police officers have an authorized conduct ONLY where there is an order of protection in place or where there is violence in a family dispute. Aside from those, to the case here, custody and visitation matters or violation are civil matters where absent a criminal element and absent penal law codification, it is not a police official function.

Violation of a custody order is a "violation" which punishment is determined by family court in the form of denial of visitation, reduction of time for visitation etc. An "official function" of a police officer is the enforcement of the penal law. The NY penal law, does not codifies any violation of a custody order as a crime and for that reason alone, the police enforcement of an alleged violation of a visitation order is not an authorized function.

Even more, Buffalo police Dept. own rules and regulations clearly defines the authority of a police officer in civil disputes:

> "2.16 CIVIL DISPUTES : Members shall take a neutral position in any dispute of a civil nature, acting only to prevent or control any breach of the peace that may arise". *BPD Rules & Regulations p.18,* ***Trial Exhibit P29****.*
>
> "4.11 CIVIL CASES : Employees shall not use the powers of their office to render assistance in the pursuit of matters which are strictly private or civil in nature except in those matters where they are required by law to so exercise their powers or where a breach of the peace has occurred or is imminent. ". *BPD Rules & Regulations p.27,* ***Trial Exhibit P29****.*

6

So, essentially, the Buffalo police Department recognizes that their police officers have no official duty to enforce in civil matters as indisputably civil disputes specifically here, those arising from child custody are not criminal in nature.

NY Penal Law 195.05 was specifically revised in 2013 for the purpose of "including as an element, that the predicate administration of law or other governmental or official function was authorized". The revision even gives clear mandate to the trial court that "the court should explain what constitutes an "authorized function" in the context of the facts of the case.

To prove the required "official function" element was required that the court explain in detail to the jury what is an "Authorized Function" instead the basically instructed the jury to disregard this element which ultimately was likely to influence the jury's verdict.

Plaintiff motion to address this issue was denied, that is the "Authorized function" as required for the malicious claim (plaintiff objected). The court based the denial decision relying on Judges Villardo's prior Order and Decision to the summary judgement motion brought by defendants *See* **[Docket Item 69].**
In doing so, the court erred as well. Judge Villardos decision was over summary judgement motion which has a different standard of review, said decision is not settled law and inasmuch; plaintiff will appeal such decision meaning that whereas [if] the appeal is successful, such order will become inapplicable and so the court decision to use Villardos order as controlling here means that a new trial will be as well warranted. Judges villardo didn't address, specify or agreed that the officer's actions were an "authorized function", rather, he granted immunity based to the officers in the false arrest claim on "perceived probable cause".

The court's decision instructing the jury that said element was satisfied and established, in other words, to disregard that element when making their decision, handed the trial in favor of defendants and likewise, was very unfair and detrimental for plaintiff. New trial warranted.

### 2. CLEAR ERROR EXISTS WHERE THE DEFENDANTS INTRODUCED AS EVIDENCE EXHIBIT D2F (CPL§710.30 NOTICE TO DEFENDANT IN CRIMINAL COURT OF PROSECUTION INTENTION TO OFFER EVIDENCE AT TRIAL), 2018 CLAIMS. SUCH EVIDENCE INADMISSIBLE AND THE USE OF ITS CONTENT AT TESTIMONY WARRANT NEW TRIAL.

The very same fabricated narrative that defendants introduced in the New York criminal court were presented in the trial (plaintiff objected) when defendants entered as evidence their "**Exhibit D2F**" as evidence and spoiled the jury with testimony around said inadmissible evidence. The exhibit along with the testimony given around the same allegations "the bat", delivered prejudicial value that substantially outweighed the probative value which unfairly impacted the jury's decision.

Plaintiff motion on the issue was argued and denied.

In New York State criminal cases, CPL § 710.30 mandates that the prosecution (the "People") serve the defendant with a notice of their intention to offer certain types of evidence at trial. . This is crucial for safeguarding the defendant's rights, particularly the right to challenge the admissibility of this evidence.

The notice requirement applies to:

- Statements made by the defendant to a public servant: This includes statements that, if involuntarily made, could be subject to suppression. The notice must specify the time, place, and sum and substance of the statement.
- Identification testimony: This includes testimony from a witness who has previously identified the defendant from a photograph, video, or in person.

The main purpose of CPL§ 710.30 notice is to provide the defendant with a reasonable opportunity to move to suppress the specified evidence before trial. This motion to suppress is an opportunity to challenge the admissibility of the evidence, for example, on the grounds that a statement was involuntary or an identification procedure was unduly suggestive.

CPL 710.30 notice itself is generally not a direct source of evidence admissible in a District Court Civil Trial.

Even where such statement allegedly made by plaintiff found in the CPL 710.30 notice;

> "AFTER ARREST, AFTER RIGHTS WHILE THE REAR SEAT OF PATROL VEHICLE #632 THE DEFENDANT SPONTANEOUSLY STATED TO OFC BRANDON HAWKINS "YOU GUYS ARE STUPID, YOU'RE GOING TO LOOK REAL BAD IN COURT. THE JUDGE ISN'T GOING TO DO SHIT BUT TO GIVE ME AN ACD. YOU GUYS DON'T HAVE NO CASE. YOU WON'T FIND THE BAT."

was to be actual evidence, it would still fail admissibility as the notice by itself requires trial court pretrial admissibility ruling and without it, it is no more than an unsworn piece of paper which defendants were not allowed to introduce as evidence as it violated plaintiff Constitutional right, due process rights and fairness to trial.

In New York State Courts, statements allegedly made by defendants to law enforcement cannot be used against them in court unless their voluntariness is adjudicated by a separate fact finder. Let alone to be used as evidence in District Courts.

> Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession… [U]nder the New York rule, the trial judge must make a preliminary determination regarding a confession offered by the prosecution and exclude it if in no circumstances could the confession be deemed voluntary. *See Jackson v. Denno* 378 U.S. 36884 S. Ct. 1774.

9

CPL 710.30 is a New York State Criminal Procedure Law. Its primary purpose is to notify a defendant in a criminal case that the prosecution intends to introduce evidence of a statement made by the defendant to a public servant or testimony regarding an observation of the defendant. This allows the defendant to make a motion to suppress such evidence before trial if they believe it was improperly obtained.

District courts civil trials, are governed by the Federal Rules of Evidence (FRE), not State procedural rules like CPL 710.30. The CPL 710.30 notice is a procedural document. It notifies the defendant of an intention to use evidence, but it is not the evidence itself. The admissibility of evidence in a federal court civil trial is determined by the FRE, which include considerations of relevance, reliability, and whether the evidence is hearsay.

Essentially, CPL 710.30 notice is a procedural tool in a New York State criminal case to informing the defendant about potential evidence. It doesn't automatically make that evidence admissible in a District court civil trial.

Defendants spoiled Jury verdict by presenting fabricated statements, evidence and false testimony which warrants a new trial for the 2018 claims;

> Fair trial claims based on fabrication of information are restricted to those cases in which an "(1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039.* 838 F.3d 265, 279 (2d Cir. 2016). The Second Circuit has held that "[w]hen a *police* officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (1997) (citations omitted). *See Gogol v. City of N.Y (S.D.N.Y)*.na , 21 (Aug 10, 2017)

**3. THE JURY PANEL WAS HEAVILY GENDER BIASED [SIX WOMEN AND TWO MEN], FOR THE 2016 CLAIMS ARISING OUT OF CHILD CUSTODY AND VISITATION, WAS UNFAIR TO PLAINTIFF DEFENSE.**

The 2016 claims arose out of custody/ visitation order alleged violation and involved a two years old child, plaintiff son, involving custody/ visitation disputes between the child's mother and the father. The jury pool was about sixty males and forty females. Because of the nature of the case, a panel with 75% female jurors was unfair and impartial to plaintiff.

### 4.  THE JURY PANEL WAS RACIALLY UNFAIR TO PLAINTIFF DEFENSE.

Plaintiff belongs to a minority group [Hispanic]. The jury pool consisted of about one hundred jurors and only two ethnic groups; whites and African Americans from which only about three were African Americans, and the rest White prospect Jurors.

No minority or person of color was ever able to make it near close to the Jury box but only one African American female which defendant dismissed with Peremptory Strike.

The racial unfavorable panel with such racial disparity caused unfair grounds for plaintiff defense.

### 5.  TIME FOR TRIAL PREPARATION WAS UNFAIRLY SHORT. TRIAL WAS RUSHED. WITNESS TESTIMONY UNFAIRLY OVERLAPPED FACTS AND EVENTS. TWO CASES AT ONCE UNFAIRLY DISFAVORED PLAINTIFF

A) The first trial date was set by Judge Villardo for 2/5/2024 and later changed to 12/9/2024, thereafter many tentative dates were set depending on availability where the trial was basically put on standby mode to be called in anytime iif there was an opening. Case was transferred to Judge Sinatra and on several occasions, potential trial dates were discussed. On a status conference two potential trial dates were presented: 3/17/2025 or 5/5/2025. Eventually on another status conference thereafter, 5/5/2025 was selected and another status conference to follow.

On 4/24/2025, what the parties believed to be another status conference was a reminder that trial would start on 5/5/2025. Such a short time unfairly left enough time to prepare for trial.

B) Jury selection was rushed. In a jury pool of one hundred prospects not enough time was given for proper selection of jury panel. Not enough time was afforded by the court for adequately select a gender and racial balanced jury panel.

C) Testimony from nine police officers was unfairly rushed, five officers were examined in one day and four officers the next day which was very unfair. Where two separate cases were joined, five officers were involved in the 2016 claims and four officers were involved in the 2018 claim. Testimony from those officers overlapped due to defendant availability and doing so unfairly confused the jury and was very hard to keep engagement over two separate factual events.

While normally the court may not normally accommodate order of testimony due to availability, in this case there were two separate incidents and two groups of testimony. In particular, officers were examined overlapping incidents which unfairly confused the Jury engagement and ultimately verdict.

D) Two separate and unrelated actions were merged into one claim. By having the two actions in front of the same Jury panel unfairly affects the outcome of the trial as the jury may unconsciously infer plaintiff culpability by having to cases at the same time.

### 6. MOTION TO QUASH THE SUBPOENA BROUGHT BY HON. BRENDA FREEDMAN SHOULD HAVE BEEN DENIED.

The motion to quash the subpoena to testify had no legal basis to be granted and should have being denied. The subpoena complied with all the legal requisites and suppression of the witness testimony was unfair.

### 7. PLAINTIFF EXHIBIT PX25 [COURT EXIBIT 1] WAS NOT ALLOWED TO BE ADMITTED BY THE COURT. THAT PRECLUDED FAIR TRIAL TO THE 2016 CLAIM.

Officer Mark P. Andrzejak testimony was a key component in demonstrating; a) the element of "Authorized function", b) the malice element and drastically advance the fair trial presentation. The evidence was fairly authenticated as it was an audio recording between the officer and the plaintiff himself in which a confession was made. The court exclusion of that evidence and the use of it very unfairly affected the outcome of the trial disfavoring plaintiff. Defense counsel opposed the evidence about 15 minutes before trial continuance in the form of email and on the grounds of relevancy. The court unfairly granted defendants request and marked part of transcript to the recording as **Court Exhibit 1**.

### 8. EXHIBITS [EVIDENCE] THAT WASN'T ADMISSIBLE WERE GIVEN TO THE JURY FOR DELIVERATION.

During jury deliberation, two pieces of evidence [Exhibits] were sent to the jury deliberation room before the verdict which were inadmissible evidence and unfairly influenced jury verdict. During trial, plaintiff handed each and every piece of evidence and exhibit to be introduced. In the opposite, plaintiff didn't have an opportunity to review defendants' evidence and exhibits intended to be used as they were never exchanged with plaintiff from defendants.

A) **EXHIBIT D2F (CPL§710.30 NOTICE) :** As shown hereinabove in argument #2, the 710.30 notice is an unsworn, hearsay inadmissible statement that should have never be

13

introduced to trial but made it to the Jury deliberation marked as exhibit D2F and admitted as evidence. The statement found in said notice was the basis of defendant's argument and unfairly influenced the jury.

B) **EXHIBIT P2 (FAMILY COURT DECISION & ORDER) :** This exhibit was admitted by plaintiff only because the issue of whether the family court order was violated was never addressed by the court and this was the only way to show the jury that the custody order was not violated at the time of the incident. Should the issue of the court order violation would have being addressed and this document would have being irrelevant. The only part of the document shown to the witness for testimony was the last page that read as follows:

"NOW, THEREFORE, its hereby
ORDERED, that Respondent-Mother, ALBA ALVAREZ is awarded Sole
Custody of the parties son....Born ...... and it is further
ORDERED, that Petitioner-Father, CARLOS SANCHEZ shall have access
with.... On Mondays and Wednesdays from 8:00 am until 8:00pm and alternate
weekends from Friday at 7:00pm until Sunday at 7:00pm........"

And that was the only part of the document the jury was allowed to review. By sending the whole document of seven pages unfairly influenced the jury deliberation

## 9. DEFENSE COUNSEL UNFAIRLY INFLUENCED JURY DELIVERATION

Defense made statements that may unfairly impact the jury's decision. During closing statements, defense counsel told the jury that "plaintiff could have testified to tell his side of the story but chose not to, why did he not take the stand?" inferring that plaintiff didn't testify for fear of examination, that somehow not taking the stand was reason for hiding something, when in fact parties have a legal right to take or not to take the stand depending on strategic reasoning.

In relation to the 2016 claims, defendant counsel stated to the jury that "the police officers were enforcing the law". As argued hereinbefore, a child custody/visitation echange is "NOT" a authorized function of the police officers and for that reason, the police officers were "NOT" enforcing the law. That statement from defendant counsel unfairly influenced the Jury.

In relation to the 2018 claims, there was audio evidence introduced where an alleged victim is heard talking in Spanish in the background. Defendant's counsel used that to tell the jury that the man was pleading for his life when none of the jury [an all-white jury] could understand the words spoken in foreign language. That was untrue as the words were totally misconstrued.

### 10. IRREGULARITY IN THE PROCEEDINGS, UNFAIR TO PLAINTIFF

Plaintiff further assert irregularity in the proceeding due to irregularities during trial. A new trial may be granted.

a) The court directive to the jury about the element of "Endangering the welfare of the child" was very vague, confusing and unfair explanation of its requirement. The court explanation that "No harm has to exist" is too broad and misleading and gave the jury the understanding that just the mere fact that the child was with the father and not the mother, that the child was in danger.

b) The audio evidence containing foreign language was exploited by defendants by inferring to the jury a picture very far and unfair to what the true words meant as there was no translation. Plaintiff at times had to fill the translator position as it was his native language in order to clarify to the jury that the words spoken in foreign language were not the accurate true words or meaning defendant was attempting to picture make believe.

c)  Defendant adopted a defense about a "Bat" that never existed and should have being stricken off the record. Plaintiff spent lots of argument and examination time on the issue of the "imaginary bat". Narrative which defendant introduced with false statements and unsupported, inadmissible evidence.

d)  Jurors with very close ties to law enforcement were allowed in the jury panel which was very unfair to plaintiff defense. Inapposite, the few jurors that could potentially level the play field were dismissed by court or the defendant.

## NOTICE OF SPECIAL PRO SE RIGHTS

*Pro se* pleadings are always to be construed liberally and expansively, affording them all opportunity in obtaining substance of justice, over technicality of form. *Maty v. Grasselli Chemical Co.*, 303 U.S. 197 (1938); *Picking v. Pennsylvania Railroad Co.*, 151 F.2d 240 (3rd Cir. 1945); *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1959); *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Puckett v. Cox*, 456 F. 2d 233 (6th Cir. 1972); and, etc., etc., etc., practically *ad infinitum.*

If the court can reasonably read the submissions, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax or sentence construction, or a litigant's unfamiliarity with particular rule requirements. *Boag v. MacDougall*, 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *McDowell v. Delaware State Police*, 88 F.3d 188, 189 (3rd Cir. 1996); *United States v. Day*, 969 F.2d 39, 42 (3rd Cir. 1992); *Then v. I.N.S.*, 58 F.Supp.2d 422, 429 (D.N.J. 1999); and, etc., along with numerous similar rulings.

When interpreting *pro se* papers, this Court is required to use its own common sense to determine what relief that party either desires, or is otherwise entitled to. *S.E.C. v. Elliott*, 953 F.2d 1560, 1582 (11th Cir. 1992). *See also, United States v. Miller*, 197 F.3d 644, 648 (3rd Cir. 1999) (court has a special obligation to construe *pro se* litigants' pleadings liberally); *Poling v. K. Hovnanian Enterprises*, 99 F.Supp.2d 502, 506-07 (D.N.J. 2000); and, etc.

Indeed, the courts will even go to particular pains to protect *pro se* litigants against consequences of technical errors if injustice would otherwise result. *U.S. v. Sanchez*, 88 F.3d 1243 (D.C.Cir. 1996). Moreover, "the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." (emphasis added) See, e.g., *Bonner v. Circuit Court of St. Louis*, 526 F.2d 1331, 1334 (8th Cir. 1975), *Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir. 1974), *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir. 1979), *Bowers v. Hardwick*, 478 U.S. 186, 201-02, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997), *O'Boyle v. Jiffy Lube International Inc.*, 866 F.2d 88 (3rd Cir. 1989), and etc., etc., etc.

## CONCLUSION

FOR THE ABOVE STATED REASONS, Plaintiff prays and respectfully moves this

Court to grant this motion for new trial as to any or all claims due to all errors of law, facts,

irregularities and unfairness practices as presented above.

And for all such other just and proper relief as this court deems just and proper.

**I declare under penalty of perjury that the foregoing is true and correct. *28 U.S.C. § 1746***

Dated and executed: this June 9th, 2025
Buffalo, New York

CARLOS M. SANCHEZ
Pro-Se Plaintiff
113 Massachusetts Ave.
Buffalo, NY 14213
(716) 563-2517
Dj13sanz@gmail.com

Docket Number_____

*CITY OF BUFFALO*

*COUNTY OF ERIE STATE OF NEW YORK*

CD #: **18-3060509**

The People of the State of New York

vs.

**CARLOS SANCHEZ DOB: 04/13/1974**

1132 E DELAVAN

BUFFALO, NY

)
)
)
)
)
)
)

**NOTICE TO DEFENDANT OF
INTENTION TO OFFER EVIDENCE
AT TRIAL (CPL 710.30 AND 700.70)**

**THE PEOPLE** INTEND TO OFFER AT TRIAL:

I. **STATEMENTS BY DEFENDANT:** EVIDENCE OF A STATEMENT MADE BY THE DEFENDANT TO *PUBLIC SERVANT* ENGAGED IN LAW ENFORCEMENT ACTIVITY OR TO A PERSON THEN ACTING UNDER HIS DIRECTION OR IN COOPERATION WITH HIM.

☐ 1. Written statement (attach copy)

☒ 2. What was said by the defendant at the time of arrest?(specify: date, place, content and to whom)

☐ 3. No statements were made.                **Arresting Officers Initials:** _____

AFTER ARREST, AFTER RIGHTS WHILE IN THE REAR SEAT OF PATROL VEHICLE #632 THE DEFENDANT SPONTANEOSULY STATED TO OFC BRANDON HAWKINS "YOU GUYS ARE STUPID, YOU'RE GOING TO LOOK REAL BAD IN COURT. THE JUDGE ISN'T GOING TO DO SHIT BUT GIVE ME AN ACD. YOU GUYS DON'T HAVE NO CASE. YOU WON'T FIND THE BAT."

II. **IDENTIFICATION OF DEFENDANT:** TESTIMONY IDENTIFYING THE DEFENDANT AS A PERSON WHO COMMITTED THE OFFENSE CHARGED BY WITNESSES WHO HAVE IDENTIFIED HIM AS SUCH PRIOR TO ARREST / TRIAL. SPECIFICALLY:

WHO MADE IDENTIFICATION OF DEFENDANT? (SPECIFY NAME **MANUEL, CARLOS**
DATE: **11/2/2018**       PLACE: **833 PROSPECT**

☐ 1. Showup Identification

☐ 2. Photograph Identification

☐ 3. Line-up

☐ 4. Observation of defendant upon some other occasion relevant to case

☒ 5. Other (specify) **POSITIVELY ID'D BY OFFICERS**



AC386-B
DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.  ) 2 F

STATE OF NEW YORK
FAMILY COURT: COUNTY OF ERIE

In the Matter of a Custody/Visitation Proceeding
Under Article 6 of the Family Court Act

CARLOS SANCHEZ

                              Petitioner

v.                                                          DECISION and ORDER

ALBA ALVAREZ
                                                            Docket Nos. V -05178-15
                              Respondent                               V -12160-15

_____

Appearances:

ELENA JOSEPHINE ANCONA, ESQ.,
Attorney for CARLOS SANCHEZ

JENNIFER MARIE McCANN, ESQ.
Attorney for ALBA ALVAREZ

RONALD M. CINELLI, ESQ.
Attorney for Child.



PLAINTIFF'S
EXHIBIT

CASE NO. 17-CV-455

EXHIBIT NO. 2

FREEDMAN, Brenda M., J.

Petitioner-Father, CARLOS SANCHEZ ["Father"] filed a Petition on April 7, 2015 against Respondent-Mother, ALBA ALVAREZ ["Mother"] seeking Custody of the parties' son, ████ ████████, born ████ ████████. Mother thereafter filed a cross-Petition on August 11, 2015 also seeking Custody. These matters were initially assigned to Erie County Family Court Judge Deanne M. Tripi. By Order of Reference to Hear and Determine executed by Judge Tripi on July 13, 2015, the matter was referred to the undersigned as Referee. On the same date, the parties signed a Stipulation for the undersigned to Hear and Determine the matter. Subsequently, the matter was re-assigned to the undersigned as Erie County Family Court Judge. Testimony was taken on September 18, 2015, November 24, 2015 and January 22, 2016. Each party testified on his/her own behalf, no third parties were called to testify, and oral Summations were made by all parties. No party requested an In Camera hearing, and the Court did not hold one given ████ young age.

Now, upon all the pleadings and proceedings held herein and upon the Court's unique opportunity to observe and evaluate the demeanor, credibility, temperament and sincerity of each witness and review the pertinent statutes and case law and apply it to the evidence adduced at Trial, I render the following Findings of Fact and Conclusions of Law, Decision and Order:

This is a de novo application for Custody and both parties seek Custody of their son, ████.

Father was born in the Dominican Republic and has lived in the United States for 22-23 years. He is financially stable, having been in the used car business for 15 years, and he has a flexible work schedule. He has an appropriate, stable residence. Father has raised two sons on his own, one of whom is a senior in high school and one of whom is in college. The Mother of those children has lived outside of the country throughout their lives and has been uninvolved in their upbringing; Father has had sole reign over decision-making. Father does not have the Mother's address, although he has a phone number for her. Father last told his sons to call their Mother two months ago. He testified he has no criminal record and has never been the subject of a Child Protective Services investigation.

Mother is employed at a collection agency and works 5 or 6 days per week. In addition to ████, who has resided with Mother since birth, Mother also has another child, ████, ██ years old, for whom she is the sole custodian. ████ has special needs and ADHD and IDD, takes prescriptive medication and sees a counselor, all of which Mother has arranged. Mother was the subject of a Child Protective Services investigation for roughly grabbing ████ hand, but that investigation was unfounded. Mother takes the children to Church on Sundays. Mother is married to a man who lives in Columbia, but testified she has had no contact with him since early 2011.

The parties met in or around September, 2013 and had an on-again/off-again relationship for a period of time. Father described their relationship as "friends with benefits", although Mother testified she had more intimate feelings for Father. Mother became pregnant in or around December, 2013. Mother testified that Father was angry she had become pregnant. Father admitted he encouraged Mother to abort the pregnancy.

████ was born in August, 2014. Father chose not to be present at Liam's birth and the parties agreed not to use his surname for ████ because, Father testified, he was uncertain of his paternity. Yet Father visited the baby in the hospital a couple days later and came to Mother's

residence frequently during ▇▇▇ first few weeks of life. The parties' relationship became rocky sometime later and Father stopped visiting. There is no dispute that Mother offered him frequent Access. However, Father often declined Access because, he testified, "I didn't want to be used as a babysitter", and Mother "offered it when she wanted to offer it", but "I don't like to be manipulated".

Father filed a Paternity Petition in Erie County Family Court on January 8, 2015 and a paternity test was ordered. Upon receipt of the results thereof, an Order of Filiation was entered upon Consent on April 7, 2015. Father then filed the instant Custody Petition. At the first appearance, on April 27, 2015, a Temporary Order was entered giving Father Access three times per week.

On April 29, 2015, the first day of scheduled Access, Father arrived for Access without a car seat. Mother asked him where his car seat was. Father refused to respond, because, he testified, he "doesn't speak to Mother if he doesn't have to". Mother then offered him the use of her car seat. Father admitted that he ignored her offer. Father testified that his plan was to take the public bus with ▇▇▇ to the store to buy a car seat, although Father admitted that bus transport to the store involved a transfer to a second bus. Mother testified she doubted Father's intention to take a bus to buy a car seat. She testified that after taking ▇▇▇ from her it appeared to her that Father intended to put ▇▇▇ in his car and drive away without placing ▇▇▇ in a car seat. She further testified that Father was illegally parked at the time and therefore could not have left his car there for the duration of a bus trip. Mother testified that she was concerned for ▇▇▇ physical safety and therefore called the police. Father admitted that after the police arrived, Mother again offered Father her car seat. Rather than accept her offer, Father forfeited his Access. Father failed to offer a reasonable explanation for refusing Mother's offer to borrow her car seat. Mother's testimony about the events that transpired on April 29 were more credible than Father's.

It was not the only time Father declined Access after entry of the Temporary Order. The Court takes judicial notice that during the course of these proceedings, Mother offered a greater Access schedule to Father, but Father rejected the offer and in fact, requested less time because he objected to being used "as a babysitter" for Mother. Father told the Court that he did not want Access whilst Mother was working because that assisted her in child care even though he acknowledged that ▇▇▇ would have to be placed in daycare during that time instead.

Father admitted he has an explosive temper, and the evidence bears this out. Mother's uncontroverted testimony is that when the parties had a dispute over money related to Mother's car, Father went over to Mother's residence and removed the plates from her vehicle, stranding Mother without transportation. Mother testified that Father became violent after she became pregnant. Father "gets like a bully, tough" when he is angry, Mother testified. On one occasion, Mother testified, and Father did not dispute, Father punched the roof of her car when she was in it and threatened "I'm this close to f***king you up." Mother also testified that in Fall, 2013 Father admitted to her that he punched and broke his flat screen TV when fighting with his son, ▇▇▇, because ▇▇▇ did not take out the garbage. Mother testified that in January, 2014, the parties were in the car together when Father received a call from his son, ▇▇▇, requesting a ride home from basketball. Mother started to turn the car around to pick up ▇▇▇, but Father yelled at her not to get involved and jumped out of the moving vehicle.

Communication is an ongoing difficulty between the parties. Father admitted that he was unwilling to speak to Mother until the last two months, and that there were periods of time earlier in the parties' relationship when he refused to talk to Mother or respond to her texts. Although both parties testified that they are getting along better and their communication has improved over the last couple of months, Mother does not think it will last. Mother believes Father will get angry if she disagrees with him, and they will again be unable to communicate or work cooperatively. Mother testified that Father refused to speak with his son for several months because he was angry with him.

Father claims Mother uses poor judgment with respect to ██ and points to her asking Father to watch her son ██ one week after meeting him. However, Father also contends that he is an apt caretaker and that he has two sons he raised himself, which serve to bolster Mother's judgment, not discredit it. Further, Mother may well have known Father better after a one week relationship than many parents know their first-time babysitters or nannies. Father failed to identify any other indicia of Mother's poor judgment.

The parties have different discipline styles. Mother testified that when ██ misbehaves, she takes things away or puts him in timeout. Mother further testified that when she told Father about ██ diagnoses and behavioral problems, Father told her it was her fault because ██ behavior was learned, that Mother was too easy on him, and that Mother should give ██ a good whipping to straighten him out. According to Mother's testimony, Father told her that ██ will have the same problems Pablo has if he is left in her care.

Father does not pay child support, and does not help support ██ financially except when the parties are getting along. Although Mother brought a child support proceeding, she abandoned it when Father took the position that he should pay the minimum amount of $25 per month. Father testified that when the parties are getting along, he will provide for ██ needs.

Both parties testified to an incident in a court elevator. Father testified that after the child support proceeding, Mother said "You're going to find out what a bitch I am" and then claimed Father assaulted her in the elevator. Mother testified that Father threatened to kill her in the elevator, grabbed her head and twisted and that caused her to be fearful.

Mother consistently expressed a desire for ██ to have a relationship with Father. She testified that it was "extremely important" for ██ to have that relationship, that Father could provide ██ with love, education and teach him "how to be a man". Mother has consistently offered Access to Father, including overnight Access after she stopped nursing, and encouraged Father to have a relationship with ██

Father offered no evidence about how he would support Mother's relationship with ██ if he were to be awarded Custody.

Mother testified she asked Father for a family medical history so she could supply it to the pediatrician, but Father has never given it to her.

Father admitted he does not know who ██ pediatrician is or the date of the last appointment.

Father admitted he is often late for picking ███ up and late for returning him following Access.

Neither party seeks Joint Custody of Liam. In any event, Joint Custody would not be appropriate given the inability of the parties to communicate or work cooperatively together as well as the imbalance of power between them. Vasquez v Barfield, 81 AD3d 1398 (4th Dept., 2011); Ingersoll v Platt, 72 AD3d 1560 (4th Dept., 2010); Christopher J.S., Sr. V Colleen A.B., 43 AD3d 1350 (4th Dept., 2007).

To determine who should be awarded Sole Custody, the Court must assess what is in the best interests of the child. The best interests of the child are determined by a review of the totality of the circumstances, Friederwitzer v Friederwitzer, 55 NY2d 89; Storch v. Storch, 282 A.D.2d 845; Lukaszewicz v. Lukaszewicz, 256 A.D.2d 1031, with a view to determining what will promote his or her welfare and happiness, Eschbach v Eschbach, 56 NY2d 167. In making a Custody determination, the court must consider all factors that could impact the best interests of the child, including the existing custodial arrangement, Cross v Caswell, 113 AD3d 1107 (4th Dept., 2014). The interest of maintaining stability is a factor to be considered, Caughill v Caughill, 124 AD3d 1345 (4th Dept., 2015); Clouse v Clouse, 110 AD3d 1181, as it can be disruptive to remove a child from the home in which the child has primarily resided or to change a child's routine provided the child is doing well, Ellis v Burke, 108 AD3d 764. Here, Mother has been Liam's primary caretaker and has provided such care in a loving and attentive manner. Primary consideration must be given to the quality of the home environment and the parental guidance provided by each parent, Eschbach v Eschbach, supra. When there is no indication that a change will result in significantly enhancing the child's welfare, it is generally considered in the child's best interests not to disrupt his or her life. Conway v Gartmond, 108 AD3d 667; Salvati v Salvati, 221 AD2d 541. Here, there has been no proof that ███ welfare would be significantly improved by a change in his primary care, and ███ is thriving in Mother's care. The relative financial security and stability of each party are also factors to be considered, Caughill v Caughill, supra. Here, both parties have stable employment and residences. Parental fitness should be considered, Smith v O'Donnell, 107 AD3d 1311. Here, both parties are fit parents; both are aptly raising other children. The parties' respective ability to provide for the child's educational and medical needs should be considered, Stilson v Stilson, 93 AD3d 1222. Here, although either parent might be capable of providing for ███ medical and educational needs, Mother has been solely responsible for such care to date and Father has not taken advantage of the opportunity to become involved in that care. He has attended no doctor appointments and does not know the name of ███ pediatrician. Additional consideration should be given to which parent is best able to attend to the child's emotional and intellectual development, O'Connell v O'Connell, 105 AD3d 1367. Both parties likely can help support ███ intellectual development. However, whereas Mother provides a loving home and demonstrates a desire to promote ███ emotional development by supporting his relationship with his Father, Father failed to demonstrate his ability to support ███ emotional development. Instead, Father has repeatedly placed his own desires above those of ███, for example, by refusing time with his son because it would also help Mother. Father's refusal to speak to his older son for months at a time and his exhibitions of explosive temper towards his sons and towards Mother demonstrate a weakness in his ability to promote his children's emotional health. The ability of each party to foster a relationship with the other party is another important factor to be considered, Chilbert v Soler, 77 AD3d 1405. Here, Mother encourages ███ relationship with Father because she believes it is good for ███. Father has taken no steps to actively support ███ relationship with Mother. An inability to promote a relationship between the other parent and the children is inexcusable. Marino v. Marino, 90 A.D3d

1964 (4th Dept., 2011); Matter of Gloria S. V. Richard B., 80 A.D.2d 72. The court should consider which parent is more willing to encourage a relationship with the other parent, Matter of Adams v Bracci, 91 AD3d 1046, lv den., 18 NY3d 809; and that parent is clearly Mother. Additionally, Father routinely disregards Mother's needs by failing to be timely when he picks up or drops off ████, sometimes by as much as an hour. A good parent is one who is able to place a child's needs ahead of his/her own. Father has demonstrated the reverse – he has repeatedly placed his own needs ahead of ████. Although it would have been in ████ best interests to be with his father rather than with a third party caretaker when Mother was working, Father consistently refused that time with ████ in an effort to avoid helping Mother. Father refuses to help support ████ financially except during periods when he is on good terms with Mother. The Attorney for the Child supports an award of Sole Custody to Mother. Taking into consideration all factors within the totality of the circumstances of the case, Maher v Maher, 1 AD3d 987, the best interests of ████ dictate that Mother should be awarded Sole Custody.

Next, the Court must consider what, if any, visitation is appropriate under the circumstances. Visitation is a joint right of the noncustodial parent and the child, Weiss v Weiss, 52 NY2d 170, and visitation is presumed to be in the child's best interests. Cormier v Clarke, 107 AD3d 1410, lv to appeal den., 21 NY3d 865; Granger v Misercola, 21 NY3d 86. Mother proposed a specific Access schedule, to wit: that Father would have Access Mondays and Wednesdays from 8:00am until 8:00pm and alternate weekends from Friday at 7:00pm until Sunday at 7:00pm. Father did not suggest an Access proposal. The Attorney for the Child opposes overnight Access until Father completes Anger Management classes. The position of the Attorney for the Child is to be considered and is entitled some weight, but is not determinative and does not usurp the judgment of the trial court. Conway v Gartmond, 108 AD3d 667. However, the Attorney for Child correctly points out that ████ would benefit from his Father's improved management of his temper as a condition of such Access. Here we have two fit parents and a very young child. The best interests of the child generally lie in being nurtured and guided by both parents, and in order for the noncustodial parent to develop a meaningful, nurturing relationship with his or her child, visitation must be frequent and regular. Ross v Morrison, 98 AD3d 515. Mother's proposal provides for frequent and regular contacts, including overnight Access, which is in ████ best interests. The determination of visitation is within the sound discretion of the trial court based upon the best interests of the child, and its determination will not be set aside unless it lacks a sound and substantial basis in the record. Lane v Lane, 68 AD3d 995.

NOW, THEREFORE, it is hereby

     ORDERED, that Respondent-Mother, ALBA ALVAREZ is awarded Sole Custody of the parties' son, ████████ born ████████ and it is further

     ORDERED, that Petitioner-Father, CARLOS SANCHEZ shall have Access with ████ on Mondays and Wednesdays from 8:00am until 8:00pm and alternate weekends from Friday at 7:00pm until Sunday at 7:00pm; and it is further

ORDERED, that as a condition of such Access Petitioner-Father, CARLOS SANCHEZ shall complete a program of Anger Management classes.

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

_Hon. Brenda M. Freedman, JFC_

GRANTED:

ENTERED

FEB 0 8 2016

Frank J Boccio, Clerk of Family Court
By_____Clerk

Check applicable box:

X  Order Mailed On (specify date(s) and to whom mailed  3/8/16 , Carlos Sanchez, A. Alvarez, Elena Ancona Esq.
                                                        Jennifer McCann Esq,
o  Order received in court on (specify date(s) and to whom given _____    Ronald Cinelli, Esq.

At **21:00**, defendant Andrzejak comes back and says:

> "**Sir, she's not gonna give you the kid tonight...she said that she is gonna violate the court order, she's well aware that she is violating it and to petition the court, you go back to Family court and tell them that she violated the order... "**

[ some kind of report, showing that I was here]

> "**...yeah, I mean there is a 911 call generated...there is really no report because she hasn't committed a crime per se...she violated the court order from Family Court but that's something that usually your lawyer hash out there...**"

> "**...ok, well that's something that you kinda hash out_____family court, you petition the court....**"

> "**...there's a log generated from 911 and it says that you were here for custody, anybody who wants to call me and ask me what my investigation completed they're welcome to do that...that's where we are at, she knows she's violating the order, she said petition her....**"

# COURT EXHIBIT 1

**At: 22:36, defendant Andrzejak:**

> "...If I were you, I would go to Family Court Monday morning...petition under that she is violating the parameters set up by the judge...."

**At: 22:50, defendant Andrzejak:**

> "...nah, she didn't get me much of a story, I mean she basically said; I'm right in violation of the order, he can petition me if he wants, he's not gonna get his son back...."

**At 23:18,** the possibility to get something in writing about the issue

> "...no, I mean, there's no crime at this point....is a Family matter that needs to be hash out in Family Court...again, if somebody wants to call me and talk to me because I called her and spoke to her and I stood here and spoke with you..."

yeah, but I'll be honest, when I got arrested down there, was the same issue...and I got arrested.

> "...I don't remember what the issue was and I don't think it was the same issue...I think it was an allegation that you assaulted [___]"

The remaining of the conversation was about what was plaintiff charged for when arrested and said defendant venting out about being recorded. said defendant turned around and walked away stating;

> "...alright sir, good luck with everything"

**[at 25:32 - End of Audio Recording]**

2

# EXHIBIT A

# BUFFALO POLICE DEPARMENT



# RULES & REGULATIONS



**PLAINTIFF'S EXHIBIT**

CASE NO. *17-CV-455*

EXHIBIT NO. *29*

**TABLE OF CONTENTS**

ATTESTATION

LAW ENFORCEMENT CODE OF ETHICS INTRODUCTION

DEFINITIONS & GLOSSARY <u>CHAPTER I – ORDER & DISCIPLINE</u>

|       |                                          |
|-------|------------------------------------------|
| 1.1   | Obedience to Laws, Ordinances & Rules    |
| 1.2   | Familiarity with the Laws, Ordinances, Rules |
| 1.3   | Obedience to Orders                      |
| 1.4   | Issuance of Orders                       |
| 1.5   | Unlawful Orders                          |
| 1.6   | Unjust or Improper Orders                |
| 1.7   | Conflict of Orders                       |
| 1.8   | Instructions from Radio Dispatcher       |
| 1.9   | Effectiveness of Orders                  |
| 1.10  | Insubordination                          |

<u>CHAPTER II – PERFORMANCE OF AND ATTENTION TO DUTY</u>

|       |                                          |
|-------|------------------------------------------|
| 2.1   | General Duties                           |
| 2.2   | Respond When Directed                    |
| 2.3   | Reporting for Duty                       |
| 2.4   | Attention to Duty                        |
| 2.5   | Devotion to Duty                         |
| 2.6   | Absence from Duty                        |
| 2.7   | Action Request Regardless of Assignment  |
| 2.8   | Seeking Information Regarding Duties      |
| 2.9   | Driving Private Vehicle to Post          |
| 2.10  | Inspecting Area of Assignment            |
| 2.11  | Leaving Area of Assignment               |
| 2.12  | Attitude and Impartiality                |
| 2.13  | Courtesy                                 |
| 2.14  | Assistance to Fellow Employees           |
| 2.15  | Assistance to Citizens                   |
| 2.16  | Civil Disputes                           |
| 2.17  | Medical Attention to Ill/ Injured Persons |
| 2.18  | Serving Warrants/Subpoenas               |
| 2.19  | Taking Arrested Persons to Headquarters  |
| 2.20  | Appearances Required                     |
| 2.21  | Loitering or Sleeping on Duty/ Congregating |
| 2.22  | Conducting Private Business or Association on Duty |
| 2.23  | Reading on Duty                          |
| 2.24  | Meal Periods and Personal Services       |
| 2.25  | Commanding Officers Addressed by Title   |

2.26     Concealment
2.27     Civilian Passengers in Police Vehicles

CHAPTER III – GENERAL CONDUCT

3.1      Responsibility
3.2      Conduct
3.3      Frequenting Unlawful Establishments
3.4      Personal Associations
3.5      Truthfulness
3.6      Unnecessary Force
3.7      Discussing Evidence
3.8      Divulging Police Information
3.9      Information Where City Is Interested Party
3.10     Speeches, Statements, Etc.
3.11     Forwarding Information
3.12     Independent Investigations
3.13     Testimony
3.14     Accepting Rewards, Gratuities, Etc.
3.15     Testimonials, Solicitations, Etc.
3.16     Membership and Organizations
3.17     Political Activity
3.18     Seeking/ Accepting Compensation for Damages or Injury
3.19     Debts
3.20     Expenditures of Department Funds
3.21     Correspondence, Letterheads
3.22     Personal Card
3.23     Found, Recovered Property
3.24     Use of Alcoholic Beverages
3.25     Use of Tobacco
3.26     Controlled Substances
3.27     Use of Force
3.28     Firearms and Ammunition
3.29     Applications for Pistol Permits
3.30     Uniforms
3.31     Non-Uniform Attire
3.32     Outside Employment
3.33     Sick Leave

# CHAPTER IV – USE OF OFFICIAL POSITION

4.1   Use of Badge or Position for Personal Gain
4.2   Disclosing Name and Badge Number
4.3   Courtesy Cards
4.4   Using Photograph for Commercial Purpose
4.5   Using Influence of Office for Political Gain
4.6   Recommending Attorneys
4.7   Giving Surety or Bail for Persons in Custody
4.8   Withdrawing Charges
4.9   Communicating Information to Aid Evasion
4.10  Warrants for Personal Assaults
4.11  Civil Cases
4.12  Appearing As Witness; For Defense of Civil Case
4.13  Communication between Prisoners and Attorneys
4.14  Unlawful Compromise
4.15  Plea Bargaining
4.16  Connection with Liquor Establishment

# CHAPTER V – DEPARTMENTAL PROPERTY

5.1   Use and Responsibility
5.2   Reporting Loss or Damage
5.3   Qualification Required
5.4   Property Not To Be Removed
5.5   Return of Issued/ Assigned Property
5.6   Unauthorized Communication Devices
5.7   Departmental Buildings

# CHAPTER VI – REPORTS, RECORDS AND COMMUNICATIONS

6.1   Altering, Delaying. Removing or Falsifying Reports
6.2   Inspection; Copying of Reports
6.3   Departmental Business; Timeliness of Reports
6.4   Reporting Violations
6.5   Reporting Illegal Activities
6.6   Unauthorized Gifts. Gratuity, Etc.
6.7   Testimony for Defense
6.8   Information Regarding Crime
6.9   Arrests and Court Actions
6.10  Address and Telephone Number
6.11  Civil Suits; Claims for Loss or Personal Injury

# CHAPTER VII – SUPERIOR OFFICERS/ SUPERVISORS

7.1   Duties and Responsibilities; General
7.2   Abuse of Subordinates
7.3   Duty to Investigate and Report Misconduct

Rules and Regulations - 4

7.4    Exemplary Conduct Expected

7.5    Duty to Discover

ATTESTATION

By virtue of the authority vested in the Commissioner of Police by the Charter of the City of Buffalo, I hereby order the adoption of the following Rules and Regulations for the government and discipline of the Buffalo Police Department.

The precepts in the introduction are also incorporated as a part of the Rules and Regulations.

These Rules and Regulations supersede any previously issued. The right to amend or revoke these Rules and Regulations at any time is reserved to the Commissioner of Police.

Buffalo, New York
    2018

                    Byron C. Lockwood
                    Commissioner of Police

Rules and Regulations - 6

## LAW ENFORCEMENT CODE OF ETHICS

AS A LAW ENFORCEMENT OFFICER, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all persons to liberty, equality and justice.

I WILL keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department. Whatever I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I WILL never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I RECOGNIZE the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession ....law enforcement.

Rules and Regulations - 7

## INTRODUCTION

A police organization is established by law. Its employees serve those whose personal conduct they may be called upon to regulate by enforcing laws and ordinances passed by the representatives of these same people. The primary objectives of the Police Department include: protecting life and property, preventing crime, suppressing criminal activity, apprehending and prosecuting violators of the law, regulating non-criminal conduct, and preserving the peace.

In our democratic society the legislature frames and constructs the law while the judiciary interprets the law and imposes the necessary penalties upon transgressors. It is the police, however, who have the sworn duty to directly apply and execute the law fairly and objectively for the benefit of the entire community. This task has become one of the most difficult and most demanding responsibilities in the public service.

The letter of the law indicates what a member does to discharge the obligations imposed by the oath of office, but it does not encompass the consequences which may arise from the universal application of these laws. Since it is not possible to anticipate every situation that may arise, or to prescribe the specific course of action required for each case, the exercise of common sense and good judgment by those entrusted with law enforcement is necessary to make the police service equitable and effective.

An understanding of human behavior and the application of the principles of common acceptance will go far towards the realization of the primary police objectives but these two qualities alone are not sufficient to ensure the proper handling of every incident. There must also be standards of quality and general rules governing the conduct of personnel to serve as guides.

The Charter of the City of Buffalo, the contents of this manual and the Manual of Procedures, and the orders, directives and authoritative instructions of the Police Department regulate the manner in which Buffalo Police Department employees execute their specific duties.

Employees of the Police Department will be governed by specific and various rules, regulations and procedures, and violations will constitute a basis for disciplinary action.

Many of the Rules and Regulations which appear to have been deleted from the previous edition, have actually been incorporated with others and/or rephrased, i.e., rules may have undergone a change in form but not in substance. Many other rules and regulations may appear in other authoritative sources, for example, the Manual of Procedures, and have been deleted from this edition solely because of redundancy. The same high standards and intent of previous editions remain in effect.

If any section, subsection, paragraph, sentence, clause, or phrase of this Manual of Rules and Regulations for any reason is held to be invalid or unconstitutional, such decision shall not affect the validity of the remaining portions or sections of these Rules and Regulations.

This Manual is delivered to you with the requirement that you study it carefully and be fully aware of its contents and meaning. The Rules and Regulations contained are designed to fulfill a two-fold mission: first, they form the basic framework of authority within which the operating procedures and policies of the Police Department are developed and second, they are designed to provide employees with a clear guide to acceptable standards of conduct and behavior.

Rules and Regulations - 8

Nothing in this Manual of Rules and Regulations is limited in the sense of prohibiting the disciplining of, or the filing of charges against, employees because the alleged act or omission does not specifically appear herein.

Rules and Regulations - 9

## DEFINITIONS AND GLOSSARY

ACTING

Serving temporarily in a position to which the employee is not ordinarily assigned, usually in a position of higher authority. All the authorities, responsibilities, and duties of the higher position become the responsibility of the acting employee.

ASSIGNMENT

Any personnel placement made by established authority.

AUTHORITY

Legal or rightful power; a right to command or act.

AUTHORITATIVE INSTRUCTION

Any order, either verbal or written, governing policy, procedure, rules or regulations.

CHAIN OF COMMAND

In descending or ascending order of rank, the line of authority, extending from the Commissioner through every level of Command, as indicated by the Organizational Chart of the Department.

COMMANDING OFFICER

The term "commanding officer" as used herein shall refer to all employees holding a higher supervisory or command position.

CRIME

As used herein, an act or commission of an act that is forbidden or the omission of a duty that is commanded by law which makes the offender liable to punishment by law; a violation of law.

DEPARTMENT

The term "Department" as used herein shall refer to the Buffalo Police Department.

DUTY

Includes those tasks required by one's assignment, rank or status.

EMPLOYEE

The word "employee" as used herein shall include all sworn and non-sworn personnel assigned to the Department.

Rules and Regulations - 10

GENDER

The use of the masculine gender shall also include, when appropriate, the female gender.

IMMEDIATELY

The term "immediately" means as soon as possible without unnecessary delay.

INCOMPETENCE

Being incapable of the satisfactory performance of duties, which may include a lack of initiative, diligence, sound judgment, ability to take decisive action or any other trait which demonstrates incapacity or ineptness in the performance of assigned tasks.

INSUBORDINATION

The failure or deliberate refusal to promptly obey a lawful order given by a commanding/superior officer or employee; ridiculing a superior officer/employee or the superior's orders; any disrespectful, insolent, or abusive language or action toward any commanding officer.

MALFEASANCE

The doing of an unlawful act in office.

MAY

The word "may" as used herein shall mean that the action indicated is permissible.

MEMBER

The word "member" as used herein shall include any person duly appointed to the Department as a sworn police officer. Police Recruits/Probationary Police Officers are included in this definition.

MISFEASANCE

The wrongful doing of a lawful act in office.

NEGLECT OF DUTY

Failure to give suitable attention to the performance of duty. Failure to take appropriate action on the occasion of a crime, disorder, or other act or condition requiring police attention. Failure to perform duties.

NONFEASANCE

The omission of an act which should have been done while in office.

## OFF DUTY

That period of time which excludes the assigned work period. The period of time during which an employee would not normally be required to actively engage in the performance of his assigned duties.

## OFFICER IN CHARGE

The member having the highest Civil Service rank. Members of the same grade shall assume charge according to the date of appointment to that rank unless otherwise ordered by the Commissioner of Police.

## ON DUTY

That period of time when an employee is actively engaged in the performance of his assigned duties.

## ORDERS

An order is a command; a directive (either oral or written) given by one in authority and directed to a subordinate(s).

> General Order: Written orders issued by the Commissioner outlining policy on matters which affect the entire Department. A General Order is the most authoritative directive issued by the Department and may be used to amend, supersede, or cancel any other rule, regulation, or order. General Orders are permanent Departmental policy and remain in full force and effect until amended, superseded, or cancelled by the Commissioner.

> Lawful Order: Is any written or oral directive issued by any commanding officer to any subordinate or group of subordinates in the course of police duty which is not in violation of any law or ordinance or any Departmental rule, procedure or instruction.

> Special Order: Is a written directive issued by established authority outlining instructions covering particular situations.

## POLICY

Any governing principal, broad plan, or course of action, either oral or written, designed to accomplish the Department's goals.

## PROCEDURE

The official method of dealing with any given situation as prescribed by General Orders, Special Orders, Manual of Procedures, Training Bulletins or other directives.

## REPORT

A written communication unless otherwise specified.

Rules and Regulations - 12

## RULES AND REGULATIONS

The terms "rules" and "regulations" as used herein are interchangeable since both indicate basic internal departmental legislation. They refer to broad precepts of authority, responsibility or conduct. They carry the full force and effect of a direct order from the Commissioner and stand until cancelled or superseded by a direct order of the Commissioner.

## SHALL/WILL

The words "shall" or "will" as used herein shall indicate that the action specified is mandatory.

## SICK LEAVE

That period during which an employee is excused from duty under the applicable provisions of current regulations and/or prevailing contract.

## SUPERVISOR

Any person designated to act in a supervisory capacity.

## THROUGH OFFICIAL CHANNELS

In descending or ascending order of rank. Synonymous with "Chain of Command".

## CHAPTER I - ORDERS AND DISCIPLINE

1.1      OBEDIENCE TO LAWS, ORDINANCES AND RULES

a) Employees shall not violate any law of the United States, the State of New York, or the ordinances of the City of Buffalo.

b) Employees shall obey all the Rules and Regulations, General Orders, and authoritative instructions of the Department. (In order to constitute a violation of this rule, it is not necessary that a complaint be filed with the Department or with a criminal court, but only that the facts exist which would constitute a violation of the law, ordinance, rule, or authoritative instruction).

1.2      FAMILIARITY WITH THE LAWS, ORDINANCES, RULES

Employees shall study and become familiar with the Rules and Regulations, orders, directives and policies of the Department, City Ordinances, and State and Federal Laws affecting their duties.

a) Returning from absence:

Employees returning to duty from any absence shall acquaint themselves with all amendments, additions, orders, and other authoritative instructions of the Department which have been issued in their absence.

b) Unfamiliarity No Defense:

In the event of a breach of discipline, unfamiliarity with or ignorance of Rules and Regulations or General Orders shall not constitute a defense.

c) Making Changes as Directed:

It shall be the responsibility of every employee to promptly make all directed changes in any manual, text, or reference book issued to them by the Department.

1.3      OBEDIENCE TO ORDERS

Employees shall comply with all lawful orders.

1.4      ISSUANCE OF ORDERS

Orders, written or verbal, from any supervisor to any subordinate in the Department, shall be in clear, understandable language, civil in tongue and issued in pursuit of Departmental business in accordance with all legal requirements.

1.5      UNLAWFUL ORDERS

No superior officer/supervisor shall knowingly issue any order which is a violation of any law, ordinance or Departmental Rule or Procedure. Obedience to any unlawful order is never a defense for an unlawful action; therefore, no employee is required to obey any order which is contrary to Federal, State or local law or ordinance. Responsibility for refusal to obey any unlawful order rests with the employee to whom such order was given. The employee shall be strictly required to justify

Rules and Regulations - 14

such action.

**(Original 1.1 (a) above was deleted as per PERB decision of 6/25/90.)**

1.6        UNJUST OR IMPROPER ORDER

When lawful orders which appear to be unjust or improper are given, the employee to whom the order is given shall respectfully notify the superior officer/supervisor issuing such order of its impropriety. If the order is not corrected, then the order is to be carried out. After carrying out the order, the employee to whom the order was given may file a written report to the Commissioner via the Chain of Command indicating the circumstances and reasons for questioning the order, along with a request for clarification of Departmental Policy. An employee who performs an order found to be  unjust or improper by the Commissioner, but otherwise lawful, will not be held responsible for carrying out such order.


1.7        CONFLICT OF ORDERS

Employees who are given any instruction or order which conflicts with any previously received instruction or order shall call this fact to the attention of the person issuing the second order. If so directed, the latter order shall be obeyed. Previous orders or instructions shall be countermanded only when necessary. The supervisor issuing the countermanding instructions or order shall be held responsible for that action.


1.8        INSTRUCTIONS FROM RADIO DISPATCHER

All messages transmitted over the Police Radio System shall be direct and concise and shall conform with all Departmental radio procedures and the Rules and Regulations of the Federal Communications Commission.   No officer shall fail to obey or refuse to take cognizance of any communication transmitted by the Radio Dispatcher, unless directed to do so by a superior officer. Superior Officers shall be held strictly accountable for any communication/order countermanded by them.


1.9        EFFECTIVENESS OF ORDERS

All General Orders, Special Orders, Directives, Training and Legal Bulletins, Memorandums or other orders in writing that have been approved or authorized by the Commissioner, shall have the force and effect of a Departmental Rule or Regulation and shall be obeyed as such.


1.10       INSUBORDINATION

Employees shall not be insubordinate.

## CHAPTER II - PERFORMANCE OF AND ATTENTION TO DUTY GENERAL

2.1        **GENERAL DUTIES**

Members shall protect life and property, preserve the peace, prevent crime, detect and arrest violators of the law and enforce those laws of the United States, the State of New York, and Ordinances of the City of Buffalo over which the Department has jurisdiction.

2.2        **RESPOND WHEN DIRECTED**

Employees shall respond as directed by established authority.

2.3        **REPORTING FOR DUTY**

Members shall report for duty promptly at the time and place required by their assignment or as otherwise directed by the Commissioner or their Commanding Officer. They shall be properly uniformed and suitably equipped, ready to immediately assume their duties. While on duty, they shall avoid any activities not directly related to their duties and responsibilities and shall not  absent themselves from  duty  without leave. Members unable to report for duty because of sickness or injury shall notify, or cause to be notified. their commanding officer/supervisor as soon as possible prior to the start of their tour of duty. It shall be the commanding officer's responsibility to make note of tardiness and to keep a record of all tardiness.

2.4        **ATTENTION TO DUTY**

Members shall at all times be alert and vigilant in the performance of their duties and shall respond prudently but decisively when police action is required.

2.5        **DEVOTION TO DUTY**

Members, while on duty, shall devote their full time and attention to the service of the Department and to the citizens of the community.

2.6        **ABSENCE FROM DUTY**

Employees shall not be absent from duty without obtaining permission from their supervisor in accordance with current directives.

2.7        **ACTION REQUIRED REGARDLESS OF ASSIGNMENT**

Members shall take appropriate action regarding any violation of law they observe, or which is brought to their attention regardless of their assignment or duties. Exceptions may be made for persons on special duties or assignments.

2.8        **SEEKING INFORMATION REGARDING DUTIES**

Employees who are in doubt as to the nature or detail of their assignment shall immediately seek such information from their supervisor.

2.9    DRIVING PRIVATE VEHICLE TO POST

Members will not drive, use, or park a private vehicle in the vicinity of their post, except with permission of their commanding officer.

2.10    INSPECTING AREA OF ASSIGNMENT

Employees will inspect their areas of assignment as soon as possible after beginning their tour of duty and as often as possible during their tour of duty, reporting any condition requiring police attention or the attention of any other city department or agency.

2.11    LEAVING AREA OF ASSIGNMENT

Employees shall not leave their area of assignment unless:

a) on assignment from the radio dispatcher;
b) authorized by a commanding officer;
c) an incident outside of their immediate area requires police attention;
d) in close pursuit of a violator of the law.

2.12    ATTITUDE AND IMPARTIALITY

Employees, while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses and suspects.

2.13    COURTESY

Employees shall perform their duties in an efficient, courteous, and orderly manner using patience and good judgment at all times. They shall be courteous and considerate to the public, to their superior officers and to their fellow employees. They shall not use harsh, profane, or insolent language. They shall be tactful in the performance of their duties and are expected to exercise the utmost patience and discretion even under the most trying circumstances.

2.14    ASSISTANCE TO FELLOW EMPLOYEES

Employees shall aid, assist and protect their fellow employees to the full extent of their capability in times of need and in accordance with established procedures.

2.15    ASSISTANCE TO CITIZENS

Employees shall, in accordance with policies and procedures of the Department, render all possible police service to any citizen seeking information or assistance.

2.16    CIVIL DISPUTES

Members shall take a neutral position in any dispute of a civil nature, acting only to prevent or control any breach of the peace that may arise.

2.17    MEDICAL ATTENTION FOR ILL/INJURED PERSONS

Employees shall insure that any injured or ill person is given the opportunity for medical attention.

Rules and Regulations - 18

2.18    SERVING WARRANTS/SUBPOENAS

Employees are to serve all warrants and subpoenas in accordance with current statutes and directives.

2.19    TAKING ARRESTED PERSONS TO HEADQUARTERS

Employees taking custody of arrested persons will send or take these persons to the place of booking immediately unless directed otherwise a commanding officer or when medical attention is required.

2.20    APPEARANCES REQUIRED

a) Employees, when notified by competent authority, shall appear promptly at the appointed time and place before any court or tribunal. If subpoenaed, they shall notify their supervisor and other authority as required. They shall not absent themselves from any trial or hearing except for good cause in which case they shall notify the Assistant District Attorney, the Court Attendant or whoever is in authority over the hearing board or internal investigative body.

b) Employees must respond to inquiries when ordered to appear before any authorized investigating body, judicial tribunal, hearing board, or persons authorized to take testimony. All employees shall be dressed in accordance with current directives when testifying and be punctual in attendance.

2.21    LOITERING OR SLEEPING ON DUTY/CONGREGATING

a) Employees shall not loiter or sleep on duty.

b) While on duty, employees shall not congregate about public places or engage in recreation or games of chance unless necessary in the performance of duty and approved by a supervisor.

c) Off-duty employees shall not congregate or loiter about public places while in recognizable uniform.

2.22    CONDUCTING PRIVATE BUSINESS OR ASSOCIATION ON DUTY

Employees shall not devote any of their on-duty time to the pursuit of any private business, private enterprise or personal association.

2.23    READING ON DUTY

Employees shall not, to the detriment of their duties or in public view, read newspapers, periodicals, or books while on duty. Publications and material pertaining to the police field may be read or studied as long as proper and efficient performance of assigned duties is not impaired.

2.24    MEAL PERIODS AND PERSONAL SERVICES

Employees shall obtain meal periods and personal services in compliance with current directives.

2.25    COMMANDING OFFICERS ADDRESSED BY TITLE

Employees, while on duty, shall address commanding officers by title.

2.26    CONCEALMENT

Employees shall not conceal themselves while on duty except for a police purpose.

2.27    <u>CIVILIAN PASSENGERS IN POLICE VEHICLES</u>

Members shall not transport nor allow any civilian to enter or ride in a police vehicle without first notifying and obtaining the permission of the Radio Dispatcher. If permission is granted by the Radio Dispatcher, the officer requesting permission shall announce the departure and destination points and the beginning and ending vehicle mileage. The Radio Dispatcher will announce the times of departure and arrival.

## CHAPTER III - GENERAL CONDUCT

3.1        RESPONSIBILITY

a) It shall be the responsibility of every member of the Department to familiarize themselves with the rules, regulations, orders and procedures of the Department, particularly as they relate to the position the member holds, and to obey them.

b) Employees shall have a thorough knowledge of the duties of the position they hold and shall perform those duties with diligence.

c) Every member of the Department shall be competent to perform the duties of the position he/she holds. Manifest inability, failure, or neglect to perform the duties incumbent upon him by virtue of his/her position or assignment shall be the subject of disciplinary action.

d) Members assigned to temporary "Acting" duty shall have the same authority and responsibility as the regularly assigned member, and shall perform their duties with diligence.

3.2        CONDUCT

a) Employees shall so conduct themselves in both their private and professional lives as to avoid bringing discredit upon the Department.

b) No employee shall conduct himself in such a manner, or perform any act, which is prejudicial to the good order, discipline or reputation of the Department, although such action is not specifically prohibited by any rule or order; and this whether the employee is on or off duty.

3.3        FREQUENTING UNLAWFUL ESTABLISHMENTS

Employees shall not knowingly enter or remain in any premise wherein the laws of the Unites States, the State, or the local jurisdiction are violated, except in the direct performance of their duties.

3.4        PERSONAL ASSOCIATIONS

Deleted as per PERB decision of 6/25/90.

3.5        TRUTHFULNESS

Employees are required to be truthful in speech and writing whether or not under oath.

3.6        UNNECESSARY FORCE

Members shall not use unnecessary force or violence toward any person, but shall use only such force as may be necessary to accomplish their lawful purpose and in conformity with existing law.

3.7        DISCUSSING EVIDENCE

Employees shall not discuss with the media, or any other person, the evidence arising out of a criminal investigation or civil proceeding without the knowledge and permission of their commanding officer or established authority or unless otherwise mandated by law.

3.8      DIVULGING POLICE INFORMATION

Employees shall not divulge police information to which they have access or which may come to their attention, nor shall they make any information contained in police records available to anyone except as provided by law or established authority.

3.9      INFORMATION WHERE CITY IS INTERESTED PARTY

Employees shall not divulge to any but authorized persons, information concerning any incident or investigation in which the City of Buffalo is, or could become, an interested party. All inquiries regarding such matters shall be referred to the Corporation Counsel.

3.10     SPEECHES, STATEMENTS, ETC.

a) Employees shall not fill speaking engagements, nor cause to be published, any article or writing, nor permit their names or photographs to be used in connection with any commercial advertising or promotion, as a representative or spokesman for the Department, without the approval of the Commissioner.

b) Deleted as per PERB decision of 6/25/90.

3.11     FORWARDING INFORMATION

Employees having information on any police matter, in which they are not directly concerned, shall forward, through their commanding officer, all such information to the Departmental subdivision concerned. Such information shall not be withheld under any circumstances.

3.12     INDEPENDENT INVESTIGATIONS

Except in circumstances requiring immediate police action; employees shall not conduct independent investigations outside their regularly assigned duties, without authority of a higher commanding officer. If, due to exigent circumstances, such an investigation is initiated, that fact, together with all information gathered, will be communicated to the employee's supervisor or other affected unit at the earliest possible opportunity.

3.13     TESTIMONY

When called upon to do so, employees shall give testimony completely, impartially, and without reservation, and with no desire or design to influence the result.

3.14     ACCEPTING REWARDS, GRATUITIES, ETC.

Employees shall not accept any reward, gift or gratuity as a result of any services rendered in the line of duty without first obtaining the permission of the Commissioner of Police.

3.15     TESTIMONIALS, SOLICITATIONS, ETC.

a) Employees shall not bestow testimonials or gifts on other employees of the Department without the permission of the Commissioner.

b) Employees shall not collect money, nor circulate subscription papers nor sell tickets or solicit donations, prizes or gifts for charitable or any other purpose, except upon prior permission of the Commissioner.

Rules and Regulations - 22

c) Employees shall not resort to the use of telephone, mail or handbill, or any program or advertisement in such program, or any form of printed admission, when, in so doing, the name of the Buffalo Police Department or any of the Police subdivisions, is used in furtherance of such sale or solicitation, except with the express written permission of the Commissioner.

d) Employees shall not retain any promoter or promotional agency for the purpose of solicitation or sale of tickets or other form of admission, or any program, or advertisement in such program for the benefit of the Department or any of its members, by using the Department name as a means of effecting or promoting such sale.

e) Employees shall not cause or permit to be printed or otherwise manufactured, any ticket or other form of admission, program, or other matter for the purpose of sale or solicitation, on which the name of the Department is used, without first obtaining the permission of the Commissioner.

3.16    MEMBERSHIP AND ORGANIZATIONS

a) Employees shall not join or be a member of any organization or society whose object or purpose, either directly or indirectly, would adversely affect the discipline or conduct of the employee or Department.

b) Employees shall not knowingly be connected with or be a member of any subversive organization except in the line of duty and with the knowledge and consent of the Commissioner.

3.17    POLITICAL ACTIVITY

a) Employees shall not join, or become members of any political club, association, society, or committee, or engage in any political activity, except as is permitted by law, and in no event if such membership or activity would interfere with or adversely affect, the performance of their Departmental duties.

3.18    SEEKING/ACCEPTING COMPENSATION FOR DAMAGES OR INJURY

Employees shall not seek, claim, litigate, or solicit, nor shall they accept from any person or agency any money or compensation for damages, expenses or injury incurred by them in the line of duty without prior written permission of both the Commissioner of Police and the Corporation Counsel.

3.19    DEBTS

Employees shall pay all just debts and satisfy legal liabilities incurred by them.

3.20    EXPENDITURES OF DEPARTMENT FUNDS

Employees shall not spend any monies or incur any financial obligations in the name of the Department without prior knowledge and permission of the Commissioner of Police.

3.21    CORRESPONDENCE, LETTERHEADS

a) All correspondence leaving the Department shall be issued only with the signature of the Commissioner of Police or as authorized by the Commissioner of Police.
b) The official letterhead of the Department shall not be used for unofficial correspondence.

Rules and Regulations - 23

3.22    PERSONAL CARDS

Employees shall not possess or use business cards or any other identification cards bearing Departmental affiliation and/or rank, except as authorized by the Commissioner of Police.

3.23    FOUND, RECOVERED PROPERTY

Employees shall, in accordance with current directives, transmit immediately to the custody of the Bureau of Administrative Services all found, confiscated, or recovered property coming into their possession.

3.24    USE OF ALCOHOLIC BEVERAGES

a) Employees shall not drink, purchase or have in their possession any alcoholic beverage while on duty, except in the performance of their official duty, nor shall any alcoholic beverage be brought into any police facility except in the performance of duty.

b) Employees, who are off duty in uniform or in any recognizable part of their uniform, shall not drink alcoholic beverages in public view.

c) Employees, while off duty, shall not drink any alcoholic beverages to the extent which renders them unfit to perform or report for duty or which results in the commission of an act which might tend to discredit the Department.

3.25    USE OF TOBACCO

Employees shall not chew or smoke tobacco while on duty and in public view, in such a manner as to adversely affect the professional image of the Department.

3.26    CONTROLLED SUBSTANCE

Employees, whether on or off duty, shall not possess or use any non-prescribed controlled substance, except for that possession occurring in the line of official duty.

3.27    USE OF FORCE

Employees shall use force only as necessary and in accordance with current law and directives.

3.28    FIREARMS AND AMMUNITION

a) The indiscriminate and careless use of firearms is strictly prohibited.
b) Employees shall be responsible for the security of their firearms at all times.
c) Employees shall immediately report the loss, theft, sale or disposal of a firearm capable of being concealed on the person.
d) Sworn members of the Department shall report the acquisition of any firearm capable of being concealed on the person, or the alteration of any such weapon already possessed, to the Firearms Unit for recording of same.
e) While on duty, Officers shall wear their sidearm in the prescribed manner. When off-duty, they may carry their sidearm concealed on their person, in any manner they select.
f) While on duty, Officers shall only carry, use or discharge those firearms which have been duly approved and registered with the Firearms Unit. Officers must be qualified by the Firearms Unit for any weapon(s) possessed or carried by them while on duty.

g) While on duty, Officers shall carry, use or discharge only those types of ammunition which have been duly approved by the Buffalo Police Department.

h) While on duty, Officers are restricted from dry−firing or other forms of practice with a firearm, except under the personal direction of a Firearms Instructor.

i) Firearms shall not be used against another person except in extreme cases and only then if in conformity with the provisions of Penal Law, Article 35, "Defense of Justification". The discharge of a firearm at or from a moving vehicle is strictly forbidden except when justified within Article 35 of the Penal Law.

j) Members shall use their utmost discretion in discharging their firearms. If a member discharges his firearm for any reason, he/she shall immediately report same to his superior Officer and shall complete and file all reports as required by current directives.

k) No employee, other than a sworn member of the Department, shall possess or carry any type of firearm while on duty, except with the express written permission of the Commissioner.

### 3.29    APPLICATIONS FOR PISTOL PERMITS

Employees shall not endorse applications for pistol permits as character references.

### 3.30    UNIFORMS

Employees whose assignment requires the wearing of a uniform shall wear such uniform in the manner prescribed.

### 3.31    NON-UNIFORM ATTIRE

Employees working in non-uniform assignments shall wear attire appropriate to their duties and assignments in a manner prescribed by current directives.

### 3.32    OUTSIDE EMPLOYMENT

Employees may engage in outside employment subject to the approval of the Commissioner of Police and in accordance with law and current directives.

### 3.33    SICK LEAVE

Employees on sick leave shall not leave their place of residence except in accordance with current directives.

# CHAPTER IV – USE OF OFFICIAL POSITION

## 4.1    USE OF BADGE OR POSITION FOR PERSONAL GAIN

Employees shall not use, or attempt to use, their official position, badge or credentials for personal or financial gain or for personal vengeance. Employees shall not permit any other person to use their badge or credentials for any purpose whatsoever.

## 4.2    DISCLOSING NAME AND BADGE NUMBER

Members shall give their name and badge number to any person requesting such information.

## 4.3    COURTESY CARDS

No employee of the Department, either individually or representing any organization within the Department, shall give or issue to any person, other than a member of the Department, active or retired, any card, button or device which could be construed as granting to, or requesting for, the holder, any special privilege or consideration.

## 4.4    USING PHOTOGRAPH FOR COMMERCIAL PURPOSE

Employees shall not, without the permission of the Commissioner of Police, allow their names or photographs to be used in any commercial enterprise which alludes to their employment with the Department.

## 4.5    USING INFLUENCE OF OFFICE FOR POLITICAL PURPOSE

Employees shall not use the influence of their office or position for political purpose.

## 4.6    RECOMMENDING ATTORNEYS

Employees shall not solicit, suggest, recommend, advise or counsel the engagement or retention of any specific attorney, legal firm, bail bondsman, company, or of any other person or firm for any person as a result of police business. This prohibition shall not apply to employees making such recommendations to their relatives.

## 4.7    GIVING SURETY OR BAIL FOR PERSONS IN CUSTODY

Employees shall not offer or give surety or bail for any persons in custody except with the permission of the Commissioner of Police or such other person authorized by the Commissioner to give such approval. This prohibition shall not apply to employees giving surety or bail for their relatives.

## 4.8    WITHDRAWING CHARGES

Employees shall not, except as provided by the Criminal Procedure Law, withdraw arrest charges, solicit withdrawals or void traffic charges unless approved by competent authority in conformity with existing regulations  and  procedures.

## 4.9    COMMUNICATING INFORMATION TO AID EVASION

Employees shall not communicate any information which may enable persons to evade arrest and/or punishment or enable them to dispose of or secrete any evidence or contraband.

4.10    WARRANTS FOR PERSONAL ASSAULTS

Members shall not apply for a warrant for an assault upon themselves, without first reporting the circumstances, through their Commanding Officer, to the Commissioner and obtaining his permission.

4.11    CIVIL CASES

Employees shall not use the powers of their office to render assistance in the pursuit of matters which are strictly private or civil in nature except in those matters where they are required by law to so exercise their powers or where a breach of the peace has occurred or is imminent.

4.12    APPEARING AS WITNESS: FOR DEFENSE OR CIVIL CASES

Employees shall not appear as a witness for the defense in any criminal case, or in any legal proceeding in which the City of Buffalo is, or may become, a party, without first complying with Departmental Orders governing such cases.

4.13    COMMUNICATION BETWEEN PRISONERS AND ATTORNEYS

Employees shall not communicate any message between prisoners and attorneys without permission of their Commanding Officer. Employees may contact an attorney requested by a prisoner; but only for the purpose of advising the attorney of the arrest of the prisoner.

4.14    UNLAWFUL COMPROMISE

Employees shall not participate, directly or indirectly, in any unlawful compromise between complainants and offenders.

4.15    PLEA BARGAINING

Members shall not engage in, nor recommend, approve or actively consent to, the reduction or changing of a charge against a defendant.

4.16    CONNECTION WITH LIQUOR ESTABLISHMENT

Members shall not own, operate, or in any way be connected, either directly or indirectly, with any business where intoxicating liquors or beverages are manufactured or sold except in conformity with existing statutes.

## CHAPTER V - DEPARTMENTAL PROPERTY

### 5.1    USE AND RESPONSIBILITY

Departmental property shall be employed only for Departmental purposes and in conformity with the use for which it was intended. Employees shall be held responsible for the proper care and use of property and equipment assigned to or used by them. When investigation reveals that loss or damage of Departmental property or equipment was due to the negligence or carelessness of an employee or that such loss or damage was deliberately caused, such employee may be required to compensate the Department for the loss or damage.

### 5.2    REPORTING LOSS OR DAMAGE

a) Employees shall immediately report in writing to their superiors whenever Departmental property becomes unserviceable or lost or damaged while in their possession or use.
b) Superiors shall investigate and report in writing, through regular channels, whenever Departmental property is damaged, lost or destroyed due to negligence or lack of exercise of due care on the part of any employee.

### 5.3    QUALIFICATION REQUIRED

Employees shall not operate any item of Departmental equipment unless they are fully qualified and authorized to do so.

### 5.4    PROPERTY NOT TO BE REMOVED

Departmental property shall not be removed from the place to which it is assigned without proper authorization.

### 5.5    RETURN OF ISSUED/ASSIGNED PROPERTY

Departmental property entrusted, issued or assigned to an employee shall be returned by him/her upon separation from the Department. Compensation due may be withheld until he complies with this requirement.

### 5.6    UNAUTHORIZED COMMUNICATION DEVICES

No employee of the Department, while on duty, shall use, carry or have in his possession or under his control, any communication device of any nature (one or two-way radio, pager, beeper, etc.) except as authorized or issued by the Department.

### 5.7    DEPARTMENTAL BUILDINGS

a) Employees shall maintain Departmental buildings, offices and equipment in a clean and orderly condition.

b) No persons, other than employees of the Department, or persons on business, shall be permitted to remain or loiter in Police buildings, except by permission of the member in charge.

c) Only persons authorized by the Commanding Officer shall be allowed behind the desks of the various station houses, except by permission of the Officer in charge.

d) Department buildings shall not be used for other than police business, except by permission of the

Commissioner.

e) No materials such as poster, pamphlets, leaflets, handbills, circulars, including, but not limited to, political posters, advertisements, announcements, etc., can be posted, displayed or distributed to the public or to Departmental employees on police property unless such materials are first approved by the Commissioner of Police. Commanding Officers of Precincts/buildings shall forward all such materials to the Commissioner, who will determine if such materials can be distributed or displayed on Police Department property.

f) No television sets shall be played, kept, or stored in any Police Department building without the express written permission of the Commissioner of Police.

## CHAPTER VI - REPORTS, RECORDS AND COMMUNICATIONS

6.1        ALTERING, DELAYING, REMOVING OR FALSIFYING REPORTS

a) Employees shall not alter, delay, falsify, withdraw, remove, or request that any other person alter, delay, falsify, remove, or withdraw any report, letter, request, or other communication that is being forwarded through the chain of command. This shall not preclude the correction of errors.

b) Employees shall not dissuade any other employee from originating and submitting any lawful or proper report, whether on criminal or disciplinary matters.

c) Employees shall not falsely make or submit any type of official report or knowingly enter or cause to be entered any inaccurate, false or improper information on the records of the Department.

d) Employees shall not remove, or permit to be removed, any Departmental record, communication or report from any file or place where they are kept, without permission of the member in charge. They shall give a receipt for the same whenever such record is removed.

e) No Departmental record shall be altered, destroyed, or permanently removed, except in compliance with law and by direction of the Commissioner.

6.2        INSPECTION; COPYING OF REPORTS

None but persons authorized by law, Departmental Rule or Order, shall be permitted to see, examine or copy any Departmental record or report. Supervisors of the various branches of the Department shall establish, in conformity with existing law, rule and/or order, the conditions necessary to effect compliance with this rule.

6.3        DEPARTMENTAL BUSINESS; TIMELINESS OF REPORTS

Departmental reports shall be made at the times specified and in the manner prescribed. Departmental business shall be conducted through official channels in conformity with the Chain of Command and channeled throughout the Department in conformity with the Organizational structure of the Department.

6.4        REPORTING VIOLATIONS

Deleted as per PERB ruling of 6/25/90.

6.5        REPORTING ILLEGAL ACTIVITIES

a) Members shall report to their supervisors all suspected places of illegal activity discovered or coming to their attention while on or off duty.
b) Members shall take note of and investigate all suspicious persons and vehicles and report same in accordance with current directives.

6.6        UNAUTHORIZED GIFTS, GRATUITY, ETC.

Employees shall report in writing, to the Commissioner of Police, any offer or attempt to offer a gift, loan, fee or gratuity in violation of the Rules and Regulations.

Rules and Regulations - 30

6.7        TESTIMONY FOR DEFENSE

a) Employees who are requested or subpoenaed to testify or who intend to testify on behalf of the defense against the Department, the City of Buffalo, the "People of the State of New York", or in any criminal action shall immediately notify their supervisor and the prosecuting attorney of such request, subpoena, or intention to testify prior to testifying.

b) Employees who are requested or subpoenaed to testify against the Department of the City of Buffalo in any civil action shall immediately notify both their supervisor and the Corporation Counsel's Office of such request or subpoena.

c) The employee shall forward this information in both "a" and "b" above to the Professional Standards Division.

6.8        INFORMATION REGARDING CRIME

Employees, whether on or off duty, shall communicate promptly to their supervisors, all information on crimes, criminal activity or important happenings of which they have knowledge.

6.9        ARRESTS AND COURT ACTIONS

Deleted as per PERB decision of 6/25/90.

6.10       ADDRESS AND TELEPHONE NUMBER

a) Employees shall report their place of residence or change of residence to their Commanding Officer and to the Bureau of Administrative Services within forty-eight (48) hours of such change.

b) Employees shall report their telephone number or change in telephone number to their Commanding Officer and to the Bureau of Administrative Services within twenty-four (24) hours of such change.

6.11       CIVIL SUITS; CLAIMS FOR LOSS OR PERSONAL INJURY

a) Employees shall report any claims for damage to clothing or other personal property belonging to the employee caused by the performance of duty in conformity with the provisions of the Manual of Procedures.

b) Employees shall not seek in any way, nor accept from any person, money or compensation for damages sustained or expenses incurred by them in the line of duty without first reporting in writing to the Commissioner their intention of doing so and obtaining his permission to do so.

c) Employees who have received municipal salaries or sick benefits for illness or for personal injury sustained while either on or off duty shall report according to existing Departmental regulations any intent to seek, solicit or accept compensation/reimbursement as damages for such illness or injury. The report shall be filed before the action is taken which shall include the facts of the claim and the name of the defendant or party. The Commissioner shall be kept informed of the status of the case/claim and the final court determination or settlement.

## CHAPTER VII - SUPERIOR OFFICERS/SUPERVISORS

### 7.1        DUTIES AND RESPONSIBILITIES; GENERAL

Superior Officers/Supervisors are charged with the duty and responsibility to properly and adequately supervise employees under their authority at all times to insure compliance with all Departmental Rules, Regulations and Orders in order to insure fair and effective discipline and to promote the mission of the Department. In furtherance of that goal and to fulfill their responsibility; Superior Officers/Supervisors shall:

a) Provide that their subordinates are properly instructed in all their duties and shall be responsible for the enforcement of the law and compliance with Departmental Rules, Procedures and Orders by their subordinates.

b) Be responsible for the discipline and conduct of their subordinates and for the quality and effectiveness of the service rendered by them. In that regard, they shall thoroughly acquaint themselves with the capabilities of the personnel under their jurisdiction and shall report thereon when required.

c) At all times, strictly and impartially enforce the observance of high ethical standards of their subordinates.

d) Be responsible to insure that orders given to subordinates are properly carried out.

### 7.2        ABUSE OF SUBORDINATES

Superior Officers/Supervisors shall not injure or abuse subordinates by tyrannical, arbitrary or capricious conduct or by abusive language and shall avoid censuring them in the presence of others.

### 7.3        DUTY TO INVESTIGATE AND REPORT MISCONDUCT

Superior Officers/Supervisors shall thoroughly investigate and take proper action in conformity with existing procedures whenever a complaint is made against an employee of the Department and shall file, according to existing procedures, a complete report thereon.

### 7.4        EXEMPLARY CONDUCT EXPECTED

In furtherance of their obligation to "lead by example", Superior Officer/Supervisors shall, at all times, conduct themselves in a manner which furthers the goals and mission of the Department and which sets a proper example of conduct, decorum and attention to duty that is expected of all employees of the Department.

### 7.5        DUTY TO DISCOVER

It is not enough for a superior officer to only investigate or report on misconduct or transgressions which are brought to his/her attention. It is also his/her responsibility to discover these acts, especially where a pattern or trend has developed, and a reasonable man should have

Rules and Regulations - 32

been expected to discover such acts.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CARLOS M. SANCHEZ,

                     Plaintiff,

     -against-

THE CITY OF BUFFALO, et al.,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17-CV-455

**PLAINTIFF AFFIRMATION AND
CERTIFICATE OF SERVICE**

I, CARLOS M. SANCHEZ, deposes and says:

I am over the age of eighteen (18) years, and declare under penalty of perjury that on this June 11th, 2025, served a true and correct copy of the attached: PLAINTIFF'S: MOTION FOR NEW TRIAL PURSUANT RULE 59 to Defendant's counsel, By placing a true and correct copy thereof in a sealed postpaid envelope, which I deposited in an official depository under the exclusive care and custody of the United States Postal Services within the State of New York. to the following individual(s) at the address indicated below:

    **DAVID M. LEE**
    Corporation Assistant Counsel /Attorney for Defendants
    City of Buffalo Dept. of Law
    65 Niagara Square
    1104 City Hall
    Buffalo NY 14202

**I declare under penalty of perjury that the foregoing is true and correct. *28 U.S.C. § 1746***

Executed this _6-11-25_

                                    SIGNATURE

TO:

DAVID M. LEE/ Assistant Corporation Counsel
City of Buffalo Dept. of Law
65 Niagara Square, 1104 City Hall
Buffalo, New York 14202